**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Charles Michael Hedlund, | ) |
| Petitioner, | ) No. CV 02-110-PHX-DGC |
| | ) |
| | ) <u>DEATH PENALTY CASE</u> |
| vs. | ) |
| | ) **MEMORANDUM OF DECISION** |
| Charles L. Ryan, et al.,[1] | ) **AND ORDER** |
| Respondents. | ) |
| | ) |

Petitioner Charles Michael Hedlund, a state prisoner under sentence of death, has filed an Amended Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced in violation of the United States Constitution. Dkt. 71. The petition raises twenty-seven claims for relief. In a prior order, the Court denied Petitioner's motion for evidentiary development, denied relief on Claims 9, 11, 15, 24, and 26, and dismissed Claim 27 without prejudice. Dkt. 119. This order addresses the remaining claims and concludes, for the reasons set forth herein, that Petitioner is not entitled to habeas relief.

## BACKGROUND

In February and March of 1991, Petitioner and his step-brother, co-defendant James McKinney, embarked on a burglary spree. While planning the crimes, McKinney boasted that he would kill anyone who happened to be home during a burglary and Petitioner stated

---

[1] Charles L. Ryan, Interim Director of the Arizona Department of Corrections, is substituted as Respondent pursuant to Federal Rule of Civil Procedure 25(d).

that anyone he found would be beaten in the head.[2]

Petitioner and McKinney enlisted two friends to provide information on burglary targets and to help with the crimes. The friends, Joe Lemon and Chris Morris, were not physically involved in the burglaries in which the murders occurred. It was from Lemon and Morris, however, that Petitioner and McKinney learned that Christene Mertens would make a good target.

The first burglary occurred on February 28, 1991. Mertens's residence was the intended target that night, but she came home and scared the four would-be burglars away. A different residence was chosen, but the burglars obtained nothing of value.

The second and third burglaries occurred the next night, March 1. This time Lemon was not involved. The three participants stole a .22 revolver, a small amount of cash, some old pennies, a tool belt, and a Rolex watch.

The fourth burglary took place on March 9, 1991. This time only McKinney and Petitioner were involved. The Mertens home was picked again because Petitioner and McKinney had been told by Lemon and Morris, who knew Mertens's son, that Mertens kept several thousand dollars in an orange juice container in her refrigerator.

Mertens was home alone when Petitioner and McKinney entered the residence and attacked her. She was beaten and stabbed. Finally, McKinney held her face down on the floor and shot her in the back of the head, covering his pistol with a pillow to muffle the shot. Petitioner and McKinney then ransacked the house and stole $120 in cash.

On March 17, 1991, Petitioner and McKinney, accompanied by Lemon and Morris and their girlfriends, drove in Petitioner's car to a desert area outside of town. RT 10/28/92

---

[2] Except where otherwise noted, this summary is based on the facts set forth in the Arizona Supreme Court's consolidated opinion upholding Petitioner's and McKinney's convictions. *State v. McKinney*, 185 Ariz. 567, 571-72, 580, 917 P.2d 1214, 1218-19, 1227 (1996).

at 74; RT 10/29/92 at 90.[3]  There they encountered a party in a van to whom they unsuccessfully attempted to sell the pistol used to kill Mertens.  RT 10/28/92 at 139-40.  Subsequently, Petitioner wrapped the weapon and buried it in the ground.  RT 10/29/92 at 95.  Lemon and Morris observed Petitioner shooting his .22 rifle, which at that time was in its original, full-barreled condition.  RT 10/28/92 at 86; RT 10/29/92 at 93.  Morris testified that while in the desert on March 17 Petitioner told that him that McKinney had shot Mertens in the head.  RT 11/2/92 at 7.

Petitioner and McKinney committed the final burglary on March 22, 1991.  The target was Jim McClain, a sixty-five-year-old retiree.  McClain was targeted because Petitioner, who had bought a car from him some months earlier, thought McClain had money at his house.  Petitioner and McKinney entered McClain's home through an open window late at night.  Petitioner brought along his .22 rifle, which by this point had been sawed-off to facilitate concealment.  Petitioner and McKinney ransacked the front of the house then moved to the bedroom.  McClain was shot in the back of the head while he was sleeping.  The bullet that killed him was consistent with being fired by Petitioner's rifle.  RT 11/2/92 at 86-89.  Petitioner and McKinney then ransacked McClain's bedroom, taking a pocket watch, which officers ultimately located in a dresser in Petitioner's bedroom, and three hand guns.  Petitioner and McKinney also stole McClain's car, which was subsequently found partially submerged in a pond in the desert location where Petitioner had buried McKinney's hand gun.  RT 11/3/92 at 92, 97.

The next day, Petitioner and McKinney attempted to sell the weapons taken from McClain as well as Petitioner's sawed-off rifle; all of the weapons were stored in the trunk of Petitioner's vehicle.  A friend of Petitioner and McKinney purchased McClain's weapons but not Petitioner's rifle, RT 11/2/92 at 46-47, which Petitioner then concealed in a closet at the residence where he was staying, RT 10/29/92 at 99.  Petitioner asked Morris to dispose of the gun.  RT 10/29/92 at 99.  Officers subsequently located the weapon pursuant to a

---

[3]  "RT" refers to the court reporter's transcript.

search warrant. RT 11/5/92 at 54-55. Analysis revealed a brown substance consistent with blood on the tip of the rifle. RT 11/4/92 at 56-57. Petitioner's fingerprints were on the weapon's magazine. RT 11/2/92 at 126. His finger and palm prints were also found on McClain's briefcase, which had been opened and searched during the robbery. *Id.* at 125-26.

Petitioner and McKinney were charged with two counts of first degree murder, among other charges, and tried together before dual juries. *See* ROA 1, 5.[4] On November 12, 1992, Petitioner was convicted of second degree murder for the death of Christine Mertens and first degree murder for the death of Jim McClain. In a special verdict the jury unanimously found Petitioner guilty of premeditated murder with respect to the McClain homicide. Maricopa County Superior Court Judge Steven D. Sheldon sentenced Petitioner to death.[5] The Arizona Supreme Court affirmed the convictions and sentences. *State v. McKinney*, 185 Ariz. 567, 917 P.2d 1214 (1996). Petitioner filed a petition for postconviction relief ("PCR"), and an amended PCR petition, with the trial court. ROA-PCR 8/16/99 Pet., 3/27/00 Am. Pet. Judge Sheldon denied the amended petition without an evidentiary hearing, ROA-PCR 6/1/01 Minute Entry, and the Arizona Supreme Court summarily denied Petitioner's petition for review. PR Doc. 8.

## APPLICABLE LAW

Because it was filed after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA). *Lindh v. Murphy*, 521

---

[4] "ROA" refers to the four-volume record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court, Case No. CR-93-0377-AP. "ROA-PCR" refers to the one-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court, Case No. CR-01-0264-PC. "PR Doc." refers to the Arizona Supreme Court's docket for Petitioner's petition for review to the Arizona Supreme Court. Certified copies of the trial and post-conviction records were provided to this Court by the Arizona Supreme Court on March 8, 2002. *See* Dkt. 14.

[5] McKinney was found guilty of two counts of first degree murder and sentenced to death.

U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003). The following provisions of the AEDPA will guide the Court's consideration of Petitioner's claims.

**Principles of Exhaustion and Procedural Default**

Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears that the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982). To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). A petitioner has not fairly presented the claim unless he clearly alerts the state court that he is alleging a specific federal constitutional violation. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). A petitioner must make the federal basis of the claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of the claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and post-conviction relief proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a

prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* at 753. Objective factors constituting cause include interference by officials that makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Prejudice" is actual harm resulting from the alleged constitutional error or violation. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998). To establish prejudice resulting from

a procedural default, a habeas petitioner bears the burden of showing not merely that the errors at his trial presented a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170 (1982).

### Standard for Habeas Relief

The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 1940 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)). The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [a petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction

became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 76 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004).

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but

"objectively unreasonable." *Id.* at 409; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340; *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240. However, only the state court's factual findings, not its ultimate decision, are subject to 2254(e)(1)'s presumption of correctness. *Miller-El I*, 537 U.S. at 341-42. ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

## ANALYSIS

**Claim 1       Use of restraints at trial**

Petitioner alleges that his right to a fair trial under the Sixth and Fourteenth Amendments was violated because he was shackled throughout his trial, in view of the jurors, without a sufficient justification for the restraints. Dkt. 71 at 24.

<u>Background</u>

During their trial, Petitioner and McKinney were each required to wear a leg brace as a security measure. The brace was worn beneath the pant leg, but apparently was visible at the ankle if the pant leg was raised. *See* RT 10/13/92 at 41; RT 3/19/93 at 55-58. According to the judge, "if they keep their pant leg down . . . it looks like maybe they have a leg brace on for some deformity or handicap." RT 10/13/92 at 41. Because the brace caused them to walk with a stiff gait, Petitioner and McKinney were already seated when the jury entered and exited the courtroom. *See* RT 10/15/92 at 15-16.

At a pretrial hearing, Petitioner's counsel objected to the configuration of the courtroom, complaining the leg brace would be visible to the jurors because the jury box was located directly across from the defense table. RT 10/13/92 at 6. The court asked the prosecutor to make a record regarding the basis for restraining the defendants. *Id.* at 22. The prosecution called as its sole witness deputy sheriff Jack Lane. Sergeant Lane testified that in March 1992 an inmate had reported to a corrections officer that he, the inmate, had overheard McKinney and another inmate, a murder suspect (presumably Petitioner), discussing an escape plan in which they would jump a guard, handcuff him and take his weapon and uniform, and walk away from the jail. *Id.* at 43-44. Sergeant Lane also stated that as a matter of policy all homicide defendants were placed in leg braces when appearing in court. *Id.* at 44. He further testified that, along with the violent nature of the offenses with which Petitioner and McKinney were charged, the use of dual juries and the presence in the courtroom of a large number of family members of the victims presented additional security concerns necessitating the use of the leg braces. *Id.* at 44-45. During this testimony, the prosecutor questioned Sergeant Lane about an alleged escape attempt by McKinney in 1991; Lane was unable to confirm the information. *Id.* at 48-49.

The court subsequently explained that its ruling allowing the use of the braces was not based on the sheriff department's policy of shackling inmates accused of violent crimes, explaining that the policy itself, without consideration of its application to specific circumstances, is "entitled to no weight." RT 10/15/92 at 9. The court stated, however, that:

> Given the fact of the nature of these charges – obviously the presumption of innocence arises, I cannot presume that your clients are guilty of these charges – I think it would be irresponsible for the trial judge to close his eyes against the charges brought against the defendant in a courtroom in close proximity to jurors and staff and others who may present a real risk of harm or threat to them.

*Id.* at 11.

The court then found, referring to Sergeant Lane's testimony, that additional security concerns supported the use of the leg brace:

> I have been provided with what I have weighed and considered as reasonably

reliable evidence that there is indeed a real escape risk in this case; perhaps not in the courtroom, but one that has been articulated outside of the hearing of the Court in a fashion that indicates that both defendants were anticipated to be involved in it.

*Id.*

Next, the court noted that the original defense tables had been replaced with tables that had "a front to them that drops down approximately two of the four feet" and therefore the leg braces were "not as obvious" as they had been before. *Id.* at 13.

The court concluded by stating that it had "evaluated" all of the information and determined that the use of leg braces "is clearly called for in this case. And I have considered other alternatives and concluded that that is required and is not unduly prejudicial to your clients' right to present a defense." *Id.* at 13-14.

During trial Petitioner renewed his objections to the configuration of the courtroom and use of the leg brace. ROA 88, 93, 117. Following his conviction, Petitioner raised the issue in a motion for a new trial. ROA 142. He argued that the security concerns cited to justify use of leg braces were not well founded and that due to the arrangement of the jury box and defense tables the jurors were able to see the restraints. *Id.* In response to the motion, and out of concern that photos provided by the defense investigator inaccurately depicted the defense tables and the layout of the courtroom, the court set an evidentiary hearing to hear testimony from Richard Morris, a detention officer who was present in the courtroom throughout Petitioner's trial. RT 3/19/93 at 5-6. Morris testified that the angle at which certain photos were taken, along with the lighting provided by the camera's flash, tended to make the underside of the defense table more visible than it was to the naked eye from the jurors' perspective at trial. *Id.* at 58, 67-68, 73-74. The defendants presented testimony from their investigator, who had spoken with three of the jurors after the trial. RT 3/30/93 at 47-54. The jurors informed the investigator that they had viewed the leg brace and discussed the issue with other jurors; that given the seriousness of the charges they were not surprised that such a security measure was used; and that seeing the defendants in braces had

1   no effect on the verdict.[6]  *Id.*

2       In its order denying Petitioner's motion for a new trial, the trial court reiterated that

3   the use of the leg braces was an appropriate response to the security concerns presented by

4   the defendants.  ME 7/2/93.  The court further explained: "The evidence introduced at the

5   hearing clearly demonstrates that the defendants, had they chosen to do so, could easily have

6   facilitated the concealment of the leg brace by keeping their pants pulled down, and their legs

7   back from the front of the desk.  Clearly, the jury was not so overwhelmed by the presence

8   of the leg brace in Defendant Hedlund's case to have simply convicted him on all charges."

9   *Id.* at 7.

10      On direct appeal, the Arizona Supreme Court rejected the claim that the use of the leg

11  brace violated Petitioner's right to a fair trial:

12          In *State v. Boag,* this court commented on the obvious need to leave
        matters of courtroom security to the discretion of the judge, stating that "absent
13      incontrovertible evidence of [harm to the defendant], the trial court should be
        permitted to use such means, to secure the named ends [as circumstances
14      require]." 104 Ariz. 362, 366, 453 P.2d 508, 512 (1969).  The only evidence
        of harm Hedlund offers is a third-party, hearsay statement from a defense
15      investigator alleging one juror said she made eye contact with one of the
        defendants and that it was "eerie."  Such an unsubstantiated allegation falls far
16      short of the evidence contemplated in *Boag.*

17          When a trial judge's decision to restrain a defendant is supported by the
        record, this court has upheld that decision, even when the jury views the
18      defendant in restraints.  Here, the trial judge specifically made a record to
        document his security concerns: Hedlund attempted an escape during the
19      summer of 1991 and also made plans with another capital defendant to escape
        by attacking a guard and taking his uniform and gun.  Given the judge's well-
20      founded security concerns and the absence of evidence of specific prejudice
        to Hedlund, we cannot find that the judge abused his discretion.

21  *McKinney*, 185 Ariz. at 575-576, 917 P.2d at 1222-23 (citations omitted).

22      <u>Analysis</u>

23      The Due Process Clause forbids the routine use of physical restraints visible to the

---

26      [6] Petitioner attached to his motion for evidentiary development declarations from four
    jurors who state that they saw Petitioner's restraints during the trial.  Dkt. 106, Exs. 1-4.
27  Due to Petitioner's lack of diligence in state court, the Court denied Petitioner's motion to
    expand the record to include this information.  Dkt. 119 at 24-26.

jury. *Deck v. Missouri*, 544 U.S. 622, 626 (2005). This is because a "jury's observation of a defendant in custody may under certain circumstances 'create the impression in the minds of the jury that the defendant is dangerous or untrustworthy' which can unfairly prejudice a defendant's right to a fair trial notwithstanding the validity of his custody status." *United States v. Halliburton*, 870 F.2d 557, 559 (9th Cir. 1989) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986)).

The use of restraints requires a determination by the trial court that the restraints are justified by a specific state interest particular to a defendant's trial. *Deck*, 544 U.S. at 629; *see Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir. 2002) (criminal defendant has a constitutional right to be free of shackles in the presence of the jury absent an essential interest that justifies the physical restraints); *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) (same). Among the security concerns justifying the shackling of a defendant is the risk of escape. *See Deck*, 544 U.S. at 629; *see also Morgan v. Bunnell,* 24 F.3d 49, 51 (9th Cir. 1994); *Hamilton v. Vasquez*, 882 F.2d 1469, 1471-72 (9th Cir. 1989); *Stewart v. Corbin*, 850 F.2d 492, 497 (9th Cir. 1988).

For Petitioner to be entitled to habeas relief, the Court must find that he was physically restrained in the presence of the jury, that the restraints were seen by the jury, and that the restraints were not justified by state interests. *Ghent*, 279 F.3d at 1132; *see Deck*, 544 U.S. at 629. There is no doubt that Petitioner wore a leg brace as a security device throughout his trial, and the record suggests that the brace was visible to the jurors. Therefore, the issue before this Court is whether use of the restraints was justified by a state interest or, if not, whether its use rendered Petitioner's trial unfair. More accurately, the issue is whether, as Petitioner contends, the decision of the Arizona Supreme Court holding that the use of the brace was justified was contrary to or an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts.

The Court concludes that it was not.[7]

The cases cited by Petitioner in support of this claim are readily distinguishable. In *Dyas v. Poole*, 317 F.3d 934, 936 (9th Cir. 2003), the only rationale offered by the trial court for visibly shackling the defendant was "that the nature of the case was such that he preferred the defendants to wear leg restraints." In *Rhoden*, 172 F.3d at 636-37, the trial court did not "establish a compelling need" for shackling the defendant but based its decision on the nature of the charges and the defendant's prior convictions. The defendant "had not engaged in any disruptive behavior and had not expressed an intention to escape or to disrupt trial." *Rhoden v. Rowland*, 10 F.3d 1457, 1459 (9th Cir. 1993). In *Packer v. Hill*, 291 F.3d 569, 583 (9th Cir. 2002), *rev'd on other grounds sub nom. Early v. Packer*, 537 U.S. 3 (2002), the trial judge erred by placing the defendant in a leg brace where the only evidence of a security risk was unsworn hearsay testimony that a potential witness – not the defendant – planned to do "stuff" while in town to testify. In *Deck*, 544 U.S. at 634, where the defendant was shackled at sentencing, the record "contain[ed] no formal or informal findings" supporting the decision to shackle the defendant and the "judge did not refer to a risk of escape. . . . Rather, he gave as his reason for imposing the shackles the fact that Deck already 'has been convicted.'" Finally, in *Williams v. Calderon*, 41 F.Supp. 2d 1043 (C.D. Cal.1998), restraining the defendant at trial was erroneous because, as the district court noted on habeas review:

> There is no information in the state court record regarding the shackling. There is no indication that the issue was ever discussed by counsel and the trial court. There is no evidence that the trial court ordered petitioner to be shackled. There is no record that defense counsel objected to the shackling. Consequently, the trial court did not articulate its reasons for allowing petitioner to remain shackled and it is unclear whether any less restrictive alternatives were available and would have been adequate.

---

[7] According to Petitioner, this Court must perform an independent, de novo review of the claim because the Arizona Supreme Court incorrectly applied clearly established federal law by requiring Petitioner to show prejudice instead of requiring the State to prove that the restraints were justified. Dkt. 91 at 35-36. The Court disagrees. The decision of the Arizona Supreme Court is based on a determination that the use of the leg braces was justified by security concerns. *McKinney*, 185 Ariz. at 575-76, 917 P.2d at 1222-23.

*Id.* at 1047 (footnote omitted).

In none of these cases did the trial judge hear evidence and make an on-the-record finding that restraints were justified because of a specific security risk. Here, Judge Sheldon held a hearing and received testimony indicating that Petitioner and McKinney had discussed an escape attempt. He then made findings that the restraints were necessary and that he had considered other alternatives. The trial court's approval of the leg brace was "case specific" and "reflect[ed] particular concerns, say, special security needs or escape risks, related to the defendant or trial." *Deck*, 544 U.S. at 633; *see Marquard v. Secretary for Dept. of Corrections*, 429 F.3d 1278, 1311 (11th Cir. 2005).

Faced with this record, Petitioner argues that he did not pose the same the security risk as McKinney and that the state courts, in determining that restraints were necessary, erroneously attributed to both defendants the escape plans that were formulated by McKinney alone. Petitioner contends, and Respondents do not dispute, that the Arizona Supreme Court erred in stating that it was Petitioner rather than McKinney who was involved in the 1991 escape plans. There is no indication, however, that the state courts erred in finding that both defendants were implicated in the 1992 escape plans. Certainly Petitioner has not offered "clear and convincing" evidence that the state courts wrongly identified him as being involved in those plans.

Under clearly established federal law, the evidence elicited before the trial court was sufficient to justify the use of a leg brace to restrain Petitioner at his trial. The Arizona Supreme Court's rejection of this claim was not objectively unreasonable. Claim 1 is denied.

**Claim 2      Dual juries**

Petitioner alleges that the use of dual juries violated his right to due process and a fair trial. Dkt. 71 at 38. Respondents concede that the claim is exhausted.

Petitioner raised the dual jury issue in a special action proceeding and on direct appeal. The Arizona Supreme Court denied relief. *Hedlund v. Sheldon*, 173 Ariz. 143, 840 P.2d 1008 (1992); *McKinney*, 185 Ariz. at 571 n.1, 917 P.2d at 1221. In *Hedlund*, the court held that a trial court has the discretion to adopt specialized procedures such as impaneling

a dual jury "[a]s long as such procedures are not inconsistent with applicable constitutional and statutory procedures, as well as our rules of court." 173 Ariz. at 146, 840 P.2d at 1011. The court approved the dual jury procedures put in place by Judge Sheldon for Petitioner's trial. *Id.* On direct appeal the court addressed the issue by referring to its earlier holding in *Hedlund*. *McKinney*, 185 Ariz. at 571 n.1, 917 P.2d at 1221.

In *Lambright v. Stewart*, 191 F.3d 1181, 1187 (9th Cir. 1999) (en banc), the Ninth Circuit held "there is no per se constitutional error in the use of dual juries." Other courts have reached the same conclusion. *See, e.g.*, *Wilson v. Sirmons*, 536 F.3d 1064, 1098-1100 (10th Cir. 2008) (use of dual juries during capital defendant's trial with co-defendant did not violate his rights under the Sixth, Eighth, and Fourteenth Amendments); *United States v. Lewis*, 716 F.2d 16, 19 (D.C. Cir. 1983) ("We accept the dual jury procedure so long as it comports with the ethos of due process commanded by our stringent rules of criminal justice.").

To be entitled to relief on this claim, Petitioner must show that the use of dual juries in his case resulted in a specific due process violation. *See Lambright*, 191 F.3d at 1187 (relief denied where petitioner failed to identify any due process or "other specific trial right" compromised by the use of dual juries); *United States v. Hayes*, 676 F.2d 1359, 1366 (11th Cir. 1982) (rejecting challenge to the use of multiple juries and noting that "neither [defendant] has alleged any more than a generalized possibility of harm"); *Mack v. Peters*, 80 F.3d 230, 235 (7th Cir. 1996) ("For [a dual jury] trial to be unconstitutional, a defendant tried in such a trial must show some specific, undue prejudice."). Petitioner attempts to make this showing by identifying several instances where the use of dual juries resulted in prejudice. He cites the prosecutor's use of leading questions, which the trial court allowed as a means of limiting any potential *Bruton* issues.[8] RT 10/28/92 at 12. He also asserts that he and McKinney presented antagonistic defenses. Petitioner further claims that the presence

---

[8] *Bruton v. United States*, 391 U.S. 123 (1968), holds that the admission into evidence of a co-defendant's confession violates the defendant's rights under the Confrontation Clause when the confession incriminates the defendant as well.

of two juries limited cross-examination and led to confusing testimony, with witnesses using the plural pronouns "they" or "them" when in fact they were referring solely to McKinney. Finally, Petitioner argues that the dual trial provided a basis for the use of leg braces and other security measures and necessitated the prejudicial configuration of courtroom.[9] None of these complaints is well taken.

With respect to the prosecutor's examination of witnesses, the Arizona Supreme Court determined that the questions were not leading and noted that the answers were in fact favorable to Petitioner. *McKinney*, 185 Ariz. at 575, 917 P.2d at 1222; *see* RT 10/28/92 at 64, 122. This Court has determined that the use of leg braces did not result in a constitutional violation. To the extent Petitioner and McKinney offered antagonistic defenses or potential *Bruton* problems arose, the use of dual juries actually prevented prejudice – when appropriate, one of the juries was excused, having previously been instructed to consider only the evidence presented in court and not to speculate on the evidence presented to the other jury. RT 10/13/92 at 73; *see* ME 3/18/92. For example, Petitioner's jury was excused during the testimony of McKinney's father, who recounted a conversation with McKinney which implicated both McKinney and Petitioner. RT 11/4/92 at 3-41; *see* RT 11/5/92 at 5-32. Similarly, McKinney's jury was excused when Chris Morris testified about Petitioner's statement that McKinney had shot Ms. Mertens. RT 11/2/92 at 5-10. Opening statements and closing arguments were made to the juries separately. *See* RT 10/20/92 at 14; RT 11/10/92 at 22. Thus, "dual juries help[ed] assure . . . compartmentalization by keeping dangerous evidence away from the ears of the jurors for the defendant to whom it does not apply." *Lambright*, 191 F.3d at 1186.

---

[9] On direct appeal Petitioner cited only the first of these circumstances – the use of leading questions – as an instance of prejudice caused by the use of dual juries. Opening Br. at 24-26. Respondents therefore contend that the remaining allegations of prejudice cited in the claim are unexhausted and not properly before the Court. The Court disagrees and concludes that the additional factual allegations do not "fundamentally alter the legal claim already considered by the state courts." *Vasquez v. Hillery,* 474 U.S. 254, 260 (1986).

Petitioner provides no support for his allegation that cross-examination was impeded due to the presence of two juries. He simply asserts that counsel "were forced to tiptoe around various subjects with two key witnesses [Lemon and Morris] because of the risk of *Bruton* error." Dkt. 91 at 47; *see* Dkt. 71 at 45. This is not sufficient to show a specific due process violation. *See Wilson*, 536 F.3d at 1100 (petitioner failed to "identif[y] any specific information that might have been, but was not, elicited from a proper cross-examination of any witnesses"); *Brown v. Sirmons*, 515 F.3d 1072, 1078-79 (10th Cir. 2008) (dual jury imposes burdens on defense counsel, but relief is not warranted absent "specific instances" of prejudice). Moreover, counsel had the opportunity, and took it on several occasions, to clarify any ambiguity in the testimony of Lemon and Morris. *See* RT 10/28/92 at 52, 56; RT 10/29/92 at 54. Finally, a determination that Petitioner was not prejudiced by the use of dual juries – that in fact his jury was able to consider the evidence only as it applied to his involvement in the crimes – is supported by the fact that he was convicted of second degree murder in the death of Ms. Mertens while McKinney was convicted of first degree murder.

In *Lambright*, the Ninth Circuit noted that even in a joint trial before a single jury, where the potential dangers due to antagonistic defenses and evidence overlap are not addressed as directly as during a trial before dual juries, a defendant "must establish that the prejudice he suffered from the joint trial was so 'clear, manifest or undue' that he was denied a fair trial.'" *Lambright*, 191 F.3d at 1186 (quoting *United States v. Throckmorton,* 87 F.3d 1069, 1071-72 (9th Cir. 1996)). Petitioner has failed to make that showing. The decision of the Arizona Supreme Court was neither contrary to nor an unreasonable application of clearly established federal law. Claim 2 is denied.

**Claim 3         Rejection of plea agreement**

Petitioner alleges that his due process rights were violated when the trial judge rejected his guilty plea. Dkt. 71 at 50. Respondents contend that the claim is unexhausted, its federal basis never having been presented in state court. Dkt. 80 at 20. The Court agrees.

<u>Background</u>

On September 18, 1992, Petitioner's attorney and the prosecutor took part in an informal conference in the judge's chambers regarding a plea agreement that had been reached between Petitioner and the prosecutor.[10] RT 9/18/92 at 1. The judge indicated that he was unwilling to accept the plea because it lacked accountability for Petitioner's role in the McClain homicide. *See* RT 10/13/92 at 26-34.

Following the informal conference, the court convened on the record and put counsel on notice that it was setting a firm trial date of October 13, 1992. *Id.* Thereafter, until October 13, the record is silent regarding the status of plea negotiations. In the interim, Petitioner filed a motion to require the trial judge to recuse himself so that he could enter a plea in front of another judge. ROA 79. Petitioner's proffered reason for seeking the recusal was the appearance of impropriety arising from the judge having read letters from family members of McClain expressing their feelings about the plea rejected by the judge on September 18. *Id.*

On October 13, 1992, a hearing on Petitioner's recusal motion was held. As the Arizona Supreme Court noted, however, "the recusal hearing consisted primarily of hearsay and recollection about what happened at that meeting, what was said during telephone calls placed in the interim, and what was supposedly contained in the latest plea agreement." *McKinney*, 185 Ariz. at 574, 917 P.2d at 1221. Judge Sheldon testified that prior to discussing the plea with counsel on September 18 he had reviewed the letters from McClain's relatives, which indicated their disapproval of the proposed plea bargain. RT 10/13/92 at 25-26. The judge testified that the opinion of the victim's family members "was one of several things I considered" when determining whether to accept Petitioner's plea. *Id.* at 26. He also indicated that the agreement, by which Petitioner would plead guilty to

---

[10] As the Arizona Supreme Court observed, the meeting was off-the-record, so there was no documentation of what took place, nor is there a record of the substance of the proffered plea agreement. *McKinney*, 185 Ariz. at 574, 917 P.2d at 1221.

second degree murder with respect to Mertens and guilty to theft with respect to McClain, did not "accurately indicate the culpability of each of the Defendants" and "there needed to be much more acknowledgment of [Petitioner's] culpability in the McClain matter." *Id.* at 30. Judge Sheldon was also concerned about the disparity in sentences that would have resulted from the proposed plea agreement. *Id.* at 43-44.

Analysis

On direct appeal, Petitioner argued that the trial court abused its discretion by refusing to entertain his alleged second plea agreement. Opening Br. at 20-23. Petitioner did not cite any federal basis for the claim, the "crux" of which was "that the trial judge refused to make himself available on Friday, October 9 to review the latest plea agreement." *McKinney*, 185 Ariz. at 574, 917 P.2d at 1221-22. The Arizona Supreme Court held that the trial court did not abuse its discretion:

> There is nothing in the record showing a plea agreement was reached between Hedlund and the prosecutor after the September 18 plea was rejected. The prosecutor testified that Hedlund rejected his subsequent offer on October 6, that there was never an offer outstanding after October 7, and because no further agreement was reached, there was never a reason to go to the judge. Because this record does not indicate that a second plea agreement was ever reached and submitted, we reject the claim that the trial judge declined to further entertain a plea.
>
> It is well settled that criminal defendants have no constitutional right to a plea agreement and the state is not required to offer one. Furthermore, a plea bargain can be revoked by any party, at any time, prior to its acceptance by the court. With no right to a plea bargain and the ability of the prosecution to discontinue negotiations at will or withdraw a plea offer prior to court acceptance, we also cannot conclude that the trial judge abused his discretion by refusing to schedule a hearing to review a plea agreement that does not appear to have existed.

*Id.* at 574-575, 917 P.2d at 1221-22 (citations omitted).[11]

Petitioner did not allege that the trial court's handling of the plea negotiations violated his federal constitutional rights. *See Wilks v. Israel*, 627 F.2d 32, 38 (7th Cir. 1980) (claim that trial court abused its discretion in refusing to accept guilty plea to lesser included offense

---

[11] At the recusal hearing, the prosecutor stated that Petitioner had rejected the second plea agreement. (RT 10/13/92 at 57.)

did not sufficiently apprise state court of argument that the refusal violated petitioner's due process rights). Because the claim was not fairly presented to the state courts, it is technically exhausted but procedurally defaulted because Petitioner no longer has an available remedy in state court. *Coleman*, 501 U.S. at 732, 735 n.1.

As cause for the default Petitioner cites ineffective assistance of appellate counsel. Dkt. 91 at 51. Before ineffectiveness may be used to establish cause for a procedural default, however, the ineffectiveness itself must have been presented to the state court as an independent claim. *See Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000) ("ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"); *Murray*, 477 U.S. at 489-90 ("the exhaustion doctrine . . . generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."). A review of Petitioner's PCR petition and subsequent petition for review reveals no assertion of ineffective assistance of appellate counsel based on the failure to raise the allegations in Claim 3. Because Petitioner is now precluded by Rules 32.2(a)(3) and 32.4 from presenting this ineffective assistance claim in state court, he cannot establish ineffective assistance on appeal as cause for default of the claim.

Petitioner has failed to establish cause for the default of this claim and does not argue that a fundamental miscarriage of justice will occur if the claim is not decided on the merits. Claim 3 is procedurally barred and will be dismissed with prejudice.[12]

**Claim 4        Victim impact statements**

---

[12] The claim also fails on the merits. The United States Supreme Court has explained: "There is, of course, no absolute right to have a guilty plea accepted. A court may reject a plea in the exercise of sound judicial discretion." *Santobello v. New York*, 404 U.S. 257, 262 (1971) (citing *Lynch v. Overholser*, 369 U.S. 705, 719 (1962)). Petitioner cites *United States v. Bruce*, 976 F.3d 552, 557 (9th Cir. 1992), which interpreted Federal Rule of Criminal Procedure 11 and its bar on a judge's participation in plea negotiations as a response to the "unacceptable risk" that judicial involvement could coerce a defendant into accepting a plea agreement. Judge Sheldon did not participate in the plea process, and Petitioner argues that he was prevented from entering a plea, not that he was coerced into accepting one.

Petitioner alleges that his due process and Eighth Amendment rights were violated when the trial judge read and considered letters written by McClain's family urging the judge to reject the plea agreement. Dkt. 71 at 57. Respondents contend that the claim was never presented in state court, Dkt. 80 at 25, while Petitioner argues that he presented the claim in a special action to Arizona Supreme Court in May 1993 seeking Judge Sheldon's removal. Dkt. 91 at 57.

The record provided to this Court does not include a copy of the petition, but assuming Petitioner did raise this issue in a special action, that would not constitute "fair presentation." In Arizona, a petition for special action is a method for seeking extraordinary judicial relief and is not an adequate substitute for raising a claim on direct appeal or in a petition for review from a petition for post-conviction relief. *See* Ariz. R. Spec. Actions 1 ("[e]xcept as authorized by statute, the special action shall not be available where there is an equally plain, speedy, and adequate remedy by appeal"); *State ex rel. Romley v. Superior Court*, 198 Ariz. 164, 7 P.3d 970, 972-73 (Ariz. Ct. App. 2000) (acceptance of jurisdiction of a petition for special action is discretionary and appropriate when there is no equally plain, speedy or adequate remedy available by appeal, or when the case presents a narrow question of law of statewide importance). "Submitting a new claim to the state's highest court in a procedural context in which its merits will not be considered absent special circumstances does not constitute fair presentation." *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994); *see Moreno v. Gonzalez*, 116 F.3d 409, 410 n.1 (9th Cir. 1997); *Burns v. McFadden*, 34 F. App'x. 263, 265 (9th Cir. 2002) (raising an issue in an Arizona special action does not exhaust the claim for federal habeas purposes); *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (raising a claim in a procedural context in which the merits would not be considered absent special and important reasons does not constitute fair presentation for purposes of exhaustion).

This claim also fails on the merits. Petitioner relies on *Booth v. Maryland*, 482 U.S. 496 (1987), and *Payne v. Tennessee*, 501 U.S. 808 (1991). These cases specifically address the admissibility of victim impact evidence at a capital sentencing, prohibiting certain

information on the grounds that it would lead a jury to impose the death sentence in an arbitrary and capricious manner.[13] *Booth*, 482 at 502-03. The holdings in *Booth* and *Payne* have no bearing on the issue presented here, which concerns the trial judge's receipt of victim impact information in the context of a proposed plea agreement prior to trial. Moreover, there is no suggestion that the trial court improperly considered the information in sentencing Petitioner. Because this claim is not supported by clearly established federal law, Petitioner is not entitled to habeas relief.

Claim 4 is denied as procedurally barred and meritless.

**Claim 5        Failure to consider mitigating evidence – mental health experts**

Petitioner contends that the trial court violated his rights under the Sixth, Eighth, and Fourteenth Amendments by improperly discounting expert psychological testimony offered in mitigation at sentencing. Dkt. 71 at 59.

Background

The trial court held a four-day presentence hearing. Two mental health experts, Dr. Ronald Holler and Dr. Charles Shaw, testified for Petitioner.

Dr. Holler, a psychologist who specialized in the evaluation and treatment of abuse victims, interviewed Petitioner, conducted numerous tests, and reviewed background material concerning Petitioner's childhood. RT 7/27/93 at 6. He testified about the effects of Petitioner's abusive childhood on his "intellectual, cognitive, neuropsychological, [and] emotional functioning." *Id.* at 5.

Dr. Holler concluded that Petitioner suffered from post-traumatic stress disorder ("PTSD"), alcohol dependence, and a depressive disorder. *Id.* at 11-17. Dr. Holler also opined that Petitioner might suffer from damage to the right hemisphere of his brain and that

---

[13]  In *Booth v. Maryland*, 482 U.S. 496 (1987), the Supreme Court held that the admission of victim impact testimony at a capital sentencing constituted a per se Eighth Amendment violation. *Payne v. Tennessee*, 501 U.S. 808, 830 n.2 (1991), reversed that holding but left in place the prohibition on opinions from family members about the crime, the defendant, and the appropriate sentence.

this type of neuropsychological impairment could affect his judgment and cognitive abilities. *Id.* at 19-20. Dr. Holler described the dynamics of Petitioner's relationship with McKinney, in which Petitioner, in response to the abuse he suffered as a child, played the role of protector and displayed loyalty to McKinney. According to Dr. Holler, this suggested that Petitioner participated in the crimes under duress pursuant to A.R.S. § 13-703(G)(2). *Id.* at 22-23. Dr. Holler characterized Petitioner as a follower, but also said he could sometimes be a leader. *Id.* at 24, 35-36. He testified that Petitioner's ability to conform his conduct to the law was impaired under A.R.S. § 13-703(G)(1), but that Petitioner knew right from wrong. *Id.* at 21, 33-34. On cross-examination, however, Dr. Holler acknowledged that he made these diagnoses only after defense counsel informed him they would be helpful. RT 7/27/93 at 26-27.

Dr. Shaw, a medical doctor specializing in addictionology, testified about the nature and effects of alcoholism. *Id.* at 63-69. Dr. Shaw interviewed Petitioner in 1993. Petitioner reported to Dr. Shaw that he began drinking at age thirteen; when he was nineteen he consumed twelve to twenty beers on the weekends; by age twenty he was drinking twelve to eighteen beers every day. *Id.* at 97. Dr. Shaw also testified about the effects of Petitioner's alcoholism on his judgment at the time of the murders, suggesting that Petitioner would not have participated in the crimes if he had not been drinking. *Id.* at 76. However, Dr. Shaw did not know how much alcohol, if any, Petitioner had consumed at the time of the crimes. *See id.* at 85-90. Dr. Shaw was also unable to give an opinion about whether Petitioner could discern right from wrong at the time of the crimes. *Id.* at 85.

Other testimony at the presentence hearing was inconsistent with the severity of the alcohol problem Petitioner reported to Drs. Holler and Shaw. Friends and family members testified that Petitioner did not have a drinking problem, was not an alcoholic, and that his level of consumption was far below what he had reported to the psychiatric experts. *See id.* at 51; RT 7/23/93 at 75. In a presentence report from an unrelated conviction in 1984, when he was nineteen years old, Petitioner stated that he had consumed alcohol in the past but had quit, and that he had quit so long ago that he could not remember when he had done so.

In sentencing Petitioner, the trial court discussed the testimony of Drs. Holler and Shaw. First, the court noted that Petitioner's intellectual capabilities did not appear to be impaired. RT 7/30/93. The court discounted Dr. Shaw's opinion that Petitioner's conduct was affected by alcohol, explaining: "I don't believe that there was any reliable, credible evidence to support the conclusion that the information relied upon by Dr. Shaw was accurate or truthful." *Id.* at 18. The court found that Petitioner's self-report of alcohol abuse was contradicted by the facts of the case and by lay testimony and other evidence inconsistent with the level of alcohol abuse reported to Dr. Shaw. *Id.* at 18-19. The court stated that it had "considered the evidence of alcohol consumption as evidence of mitigation," but found "little to demonstrate that it in any [sic] substantially affected the defendant's ability to understand the unlawfulness of his conduct." *Id.* at 19-20. Furthermore, the court explicitly considered Petitioner's "dependent personality traits, his drug and alcohol abuse, and child abuse" as nonstatutory mitigation. *Id.* at 23. Finally, the court emphasized that it had reached its sentencing decision only "after carefully considering and weighing all of the aggravating or mitigating factors presented in this case, and not limited to the personality traits discussed by Dr. Holler, past drug and alcohol use discussed about [sic] Dr. Shaw, Dr. Holler and other witnesses who testified." *Id.* at 23-24.

The court expressed similar skepticism with respect to Dr. Holler's "testimony regarding the psychological symptoms exhibited by the defendant." *Id.* at 20. In rejecting Dr. Holler's testimony in support of the impairment and duress statutory mitigating factors, the court noted that there was no basis for questioning the accuracy of Dr. Holler's original opinion, which did not include a diagnosis of PTSD. *Id.* at 21. The court also determined that "there was no persuasive testimony presented that leads to the conclusion that the abuse . . . the defendant suffered as a child resulted in him being under unusual or substantial duress at the time of the murders." *Id.*

On appeal, the Arizona Supreme Court rejected Petitioner's claim that the trial court failed to consider the expert testimony. After discussing the testimony of Drs. Holler and

Shaw, the court explained:

> Hedlund correctly observes that the trial judge must consider any aspect of his character or record and any circumstance of the offense relevant to determining whether a sentence less severe than the death penalty is appropriate. In considering such material, however, the judge has broad discretion to evaluate expert mental health evidence and to determine the weight and credibility given to it. This record does not establish that the judge failed to consider any of the expert psychological testimony, only that he found some of the factual evidence for the experts' opinions lacking in credibility. The judge therefore did not violate Petitioner's constitutional rights by discounting his experts' testimony.

*McKinney*, 185 Ariz. at 578-580, 917 P.2d at 1225-27 (citations omitted).

Analysis

A sentencing court is required to consider any mitigating information offered by a defendant, including non-statutory mitigation. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996). In *Lockett* and *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982), the Supreme Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. Constitutionally relevant mitigating evidence is "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604; *see Skipper v. South Carolina*, 476 U.S. 1, 5 (1986). While the sentencer must not be foreclosed from considering relevant mitigation, "it is free to assess how much weight to assign such evidence." *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998); *see Eddings*, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given the relevant mitigating evidence."); *see also State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006) (mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence).

On habeas review, a federal court does not evaluate the substance of each piece of evidence submitted as mitigation. Instead, it reviews the record to ensure the state court allowed and considered all relevant mitigation. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th

Cir. 1994) (en banc) (when it is evident that all mitigating evidence was considered, the trial court is not required to discuss each piece of evidence); *see also Lopez v. Schriro*, 491 F.3d 1029, 1037 (9th Cir. 2007), *cert. denied*, 128 S. Ct. 1227 (2008) (rejecting a claim that the sentencing court failed to consider proffered mitigation where the court did not prevent the defendant from presenting any evidence in mitigation, did not affirmatively indicate there was any evidence it would not consider, and expressly stated it had considered all mitigation evidence proffered by the defendant).

It is amply clear from the record that the trial court and the Arizona Supreme Court, in its independent review of the sentence, considered the mitigation evidence presented by Petitioner's expert witnesses. The state courts discussed and evaluated all aspects of the testimony of Drs. Holler and Shaw. There is simply no indication that either court refused to consider the mitigating evidence these experts provided with respect to Petitioner's traumatic childhood and alcohol abuse and the effects these had on his judgment, cognitive abilities, dependence, and emotional functioning. The fact that the courts noted weaknesses and inconsistencies in the evidence, and took these deficiencies into account when weighing the mitigating information, does not amount to a constitutional violation. *See Eddings*, 455 U.S. at 114-15; *Ortiz*, 149 F.3d at 943.

Petitioner is not entitled to relief on Claim 5.

**Claim 6          Failure to consider mitigating evidence – miscellaneous**

Petitioner contends that the state courts violated his rights under the Sixth, Eighth, and Fourteenth Amendments by failing to find that his dysfunctional family background and alcohol impairment were sufficiently mitigating to warrant a sentence less than death. Dkt. 71 at 77. Petitioner alleges a similar violation with respect to the courts' failure to find sufficient mitigation based on lingering doubt about his guilt and his minor level of participation in the crimes. *Id.*

Background

Petitioner offered testimony from friends and family members, including Petitioner's

sisters. Mary Durand, a mitigation specialist, also testified about Petitioner's background. This testimony established that Petitioner was beaten and tormented by his stepmother, who berated him for his illegitimacy. *See* RT 7/26/93 at 3-12; RT 7/28/93 at 12-28. He and his sisters were underfed, poorly clothed, and lived in filthy conditions; on occasion they were deliberately locked out of the house. RT 7/26/93 at 6-8; RT 7/28/93 at 13-14. Petitioner, while he was the focus of his stepmother's abuse, also sought to protect his sisters. RT 7/26/93 at 12.

In sentencing Petitioner, the trial court specifically noted this testimony:

> I have concluded . . . that the evidence regarding Mr. Hedlund's childhood can be considered as truthful by the Court, that there were significant aspects of his childhood which were clearly abusive.

> Certainly the memories of children may, may become exaggerated with age. But there certainly were specific incidences that were testified to by the witnesses in this case that clearly have made an impression on them which they will probably not forget for the rest of their lives. This has made an impact on me. I have considered it. *I think it is the Court's obligation to consider it, whether or not it complies with the requirements in (G)(1).*

RT 7/30/93 at 23 (emphasis added).

The court then proceeded to weigh the mitigating effect of this information:

> Mr. Hedlund, I've given a great deal of consideration to the evidence that has been presented to me over the last four days by your attorneys. I don't think anyone could listen to the evidence presented by your sisters without feeling a great deal of anguish and compassion for the kind of existence that you lived as a small child.

> But I did note that the latest evidence of testimony that was given placed some of these things, the people knowing you and determining their opinions about your character, were back when you were about 14 or 15 years old. And you were 26½ years old when these offenses occurred.

> I think that some of the qualities that you exhibited as a child were commendable, certainly protecting your sisters from the beatings that they received. And I believe that that is accurate truthful testimony. I have considered your character as a young person. I've considered too the impact that the sentence in this case will have on your sisters and your family.

Judge Sheldon then addressed Petitioner's argument that mitigation existed based on doubt about his participation in the offenses:

> I've also considered, however, your conduct as an individual. And I've rejected absolutely your defense that you were not involved in the McClain

- 28 -

homicide. The jury verdict has resolved that issue for me. It is something I simply don't have to consider. But even were I asked to consider it based on the sentence, it is my conclusion . . . that you were a major participant, that you knew what was going on, and that if you did not pull the trigger yourself, you knew in all likelihood that it could very well happen because your stepbrother had already killed someone just two weeks before and you nevertheless chose to continue going along with that individual.

(RT 7/30/93 at 25-26.)

On appeal, the Arizona Supreme Court rejected Petitioner's claim that the trial court failed to give adequate consideration to his mitigating evidence and arguments:

A difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted a defendant's ability to perceive, to comprehend, or to control his actions. No such evidence was offered, and the judge did not err in concluding that Hedlund's family background was not sufficiently mitigating to require a life sentence.

Additionally, there was little evidence corroborating Hedlund's allegation that alcohol impaired his judgment, his ability to tell right from wrong, or his ability to control his behavior. Given the substantial conflicting evidence and nothing other than Hedlund's self-report to one of the psychiatric experts regarding his intoxication at the time of the murders, the judge did not err in rejecting alcoholic impairment as a mitigating circumstance.

Hedlund also claims minor participation in the murder, but there is ample evidence pointing to Hedlund as the one who killed Jim McClain. Hedlund's finger and palmprints were on McClain's briefcase, which had been rifled during the burglary and then left behind; his fingerprints were on the magazine of the rifle he had sawed off; the bullet that killed McClain could have come from his rifle; he had modified his rifle to conceal it; he concealed the rifle after the murder; he tried to convince Morris to get rid of the rifle before the police found it; and he expressed remorse after his arrest.

Many facts also indicate Hedlund's major degree of participation in both murders. He knew McKinney had threatened to kill anyone who was at the scene of a burglary; Hedlund had threatened to beat in the head anyone encountered at the scene of a burglary; he was responsible for hiding the pistol used by McKinney to kill Christene Mertens; and he participated in the attempt to conceal property stolen from McClain and in the sale of the guns stolen from McClain's house.

*McKinney*, 185 Ariz. at 578-580, 917 P.2d at 1225-27 (citations omitted).

Analysis

In Petitioner's case, the state courts fulfilled their obligations under *Lockett* and *Eddings* by considering all of the mitigating evidence and arguments offered by Petitioner, including his family background and impairment as well as the alleged residual doubt about

- 29 -

his role in the murders. With respect to the former information, Petitioner contends that the state courts erroneously applied a causal nexus requirement to the mitigating information, requiring Petitioner to show a connection between the proffered evidence and the crime. Dkt. 71 at 81-85; Dkt. 91 at 64-66. The Court disagrees.

In *Tennard v. Dretke*, 542 U.S. 274, 289 (2004), the Supreme Court held that the habeas petitioner was entitled to a certificate of appealability on his claim that Texas's capital sentencing scheme failed to provide a constitutionally adequate opportunity to present his low I.Q. as a mitigating factor. 542 U.S. at 289. The Court rejected the "screening" test applied by the Fifth Circuit, according to which mitigating information is constitutionally relevant only if it shows "uniquely severe" circumstances to which the criminal act was attributable. *Id.* at 283-84. Instead, the Court explained, the test for the relevance of mitigation evidence is the same standard applied to evidence proffered in other contexts – namely, whether the evidence has any tendency to make the existence of any fact that is of consequence to a determination of the action more or less likely than it would be without the evidence. *Id.* at 284. The Court held that evidence of impaired intellectual functioning is inherently mitigating at the penalty phase of a capital case, regardless of whether the defendant has established a nexus between the mental incapacity and the crime. *Id.* at 287.

The courts in Petitioner's case did not impose a relevancy test or any other barrier to consideration of the proffered mitigation. To the contrary, as set forth above, the trial court and the Arizona Supreme Court explicitly considered the evidence of Petitioner's traumatic childhood and substance abuse, and the trial court accepted as true the allegations regarding Petitioner's abusive childhood. The fact that the state courts, perceiving the lack of a relationship between the mitigating evidence and Petitioner's criminal conduct, assigned less weight to that evidence than Petitioner believes it warranted did not result in a constitutional violation. *See Eddings*, 455 U.S. at 114-15; *Ortiz*, 149 F.3d at 943.

Similarly, no violation occurred when the courts considered – but rejected – Petitioner's argument that lingering doubt existed about his role in the murders and that such doubt was sufficient to merit a sentence less than death. *See Johnson v. Wainwright*, 806

F.2d 1479, 1482 (11th Cir. 1986) (no evidence that judge refused to consider lingering doubt in imposing death sentence). Even assuming that residual doubt may constitute a mitigating circumstance, *but cf. Oregon v. Guzek*, 546 U.S. 517, 523-24 (2006) (no right to present new evidence of innocence at the sentencing hearing); *Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988) (residual doubt not a "circumstance of the offense"), Petitioner has not cited any authority for the proposition that a sentencer is required to accept a defendant's argument that such doubt exists or assign it a particular weight.

Petitioner is not entitled to relief on Claim 6.

**Claim 7        Juror bias**

Petitioner alleges that his right to a fair and impartial jury was violated when the trial judge refused to dismiss a juror who was distantly related to one of the murders victims. Dkt. 71 at 90. He further contends that he was entitled to a hearing before the trial judge to consider the issue of actual bias. *Id.* at 95.

<u>Background</u>

After the trial began, a juror learned from her mother that she had once been distantly related to Jim McClain. RT 10/21/92 at 48-49. The juror had been told by her mother that her stepfather's cousin had at one time been married to McClain. *Id.* at 49. The juror came forward with this information in a letter to the judge. ROA 103.

The judge and counsel interviewed the juror in chambers. The juror stated that she had never met her stepfather's cousin, and in fact did not know she existed; that her relationship with her stepfather was "very superficial"; and that she believed she could be fair and impartial. RT 10/21/92 at 49. The judge denied defense counsel's request to excuse the juror for cause. *Id.* at 51. On appeal, the Arizona Supreme Court rejected the claim that the judge abused his discretion:

> To prevail on this argument, Hedlund must establish an abuse of discretion with evidence to show that the juror was biased and could not reasonably render a fair or impartial verdict.
>
> Although this juror had been distantly related to McClain, the degree of relation was extremely tenuous and existed only by virtue of two marriages:

- 31 -

the marriage of the juror's mother to the juror's stepfather, and the marriage of her stepfather's cousin to McClain. Furthermore, because McClain was no longer married to the stepfather's cousin at the time of his murder, the juror would no longer have been related. There is nothing in the record to indicate that the juror knew the victim or the distant cousin, or that she was untruthful in stating she could be fair and impartial. The judge did not abuse his discretion by refusing to dismiss the juror for cause.

*McKinney*, 185 Ariz. at 577-578, 917 P.2d at 1224-25 (citation omitted).

<u>Analysis</u>

The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722 (1961). A violation does not occur "every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The defendant must be tried by a "jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.* Juror bias is a finding of fact determined by the state court, to which a federal reviewing court must defer under 28 U.S.C. § 2254(e)(1). *Wainwright*, 469 U.S. at 428; *see also Patton v. Yount*, 467 U.S. 1025, 1038 (1984).

Petitioner relies on *Dyer v. Calderon*, 151 F.3d 970, 981-83 (9th Cir. 1998), but the contrasts between *Dyer* and the present case are stark. The Ninth Circuit held in *Dyer* that a juror's lack of candor – including her repeated lies about the murder of her brother, who was killed in a manner similar to the way the defendant was accused of killing his victims – gave rise to a finding of implied bias. *Id.* In Petitioner's case there was no evidence that juror was not candid. To the contrary, she came forward voluntarily when she learned of the connection with McClain.

In *Dyer*, the court held that the trial judge's findings were not entitled to a presumption of correctness because "the facts were not properly developed by the state court." *Id.* at 979. Essentially, the trial judge had accepted at face value the juror's explanation that she believed her brother's death was accidental despite possessing information that made her story highly implausible. *Id.* at 973-78. The Ninth Circuit further

noted:

> A court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances. . . . An informal in camera hearing may be adequate for this purpose; due process requires only that all parties be represented, and that the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality. So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness.

*Dyer*, 151 F.3d at 974-75 (citations omitted).

Under this standard, the in-chambers discussion with the juror, the judge, and counsel was sufficient to address the issue of actual bias. In addition, *Dyer* was a pre-AEDPA case. Under the AEDPA, a state court's factual determinations are presumed correct, a burden which a petitioner must overcome by "clear and convincing evidence." 28 U.S.C. § 2254 (e)(1). Petitioner has not provided clear and convincing evidence to show that the state courts erred in finding that the juror was not actually biased.

With respect to the issue of implied bias, the Ninth Circuit recently explained: "Although the Supreme Court has not explicitly adopted (or rejected) the doctrine of implied bias, both concurring opinions in *McDonough* seem to embrace it, *see McDonough*, 464 U.S. at 556- 57, 104 S. Ct. 845 (Blackmun, Stevens, and O'Connor, JJ., concurring); *id.* at 558, 104 S. Ct. 845 (Brennan and Marshall, JJ., concurring in the judgment), and our court has inferred or presumed bias on rare occasions." *Fields v. Brown*, 503 F.3d 755, 768 (9th Cir. 2007) (footnotes omitted); *but see Brooks v. Dretke*, 44 F.3d 328, 329-32 (5th Cir. 2006) (holding that the doctrine of implied bias constitutes clearly established federal law). Thus, the Ninth Circuit has held that "bias could be implied or presumed from the 'potential for substantial emotional involvement, adversely affecting impartiality,' inherent in certain relationships." *Tinsley v. Borg,* 895 F.2d 520, 527 (9th Cir. 1990) (quoting *United States v. Allsup,* 566 F.2d 68, 71 (9th Cir. 1977)). Bias should be presumed, however, "[o]nly in 'extreme' or 'extraordinary' cases." *Id.* (quoting *Smith*, 455 U.S. at 222-23 n.* (1982) (O'Connor, J., concurring)). Examples "might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a *close relative* of one of the

- 33 -

participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Smith*, 455 U.S. at 222 (emphasis added).

Assuming that the concept of implied bias qualified as clearly established federal law, it is evident that bias could not be imputed to the juror based on her tenuous relationship with McClain. The juror was not a close relative of McClain, nor was there the potential for substantial emotional involvement based on her highly attenuated connection with the victim, about which the juror was not even aware until informed by her mother. The Arizona Supreme Court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. Claim 7 is denied.

**Claim 8      Ineffective assistance of trial counsel – plea agreement**

Petitioner alleges that counsel provided ineffective assistance by "failing to properly pursue, present, and preserve a plea agreement."[14] Dkt. 71 at 97. He contends that counsel failed to pursue plea negotiations and when an agreement was reached presented it in an untimely and procedurally inappropriate manner.

In its discussion of Claim 3, the Court set out the circumstances surrounding the failed plea agreement. Petitioner presented this ineffective assistance claim in his PCR petition, arguing that counsel "should have aggressively pursued a plea agreement" and that counsel "failed to properly present [the plea] agreement to the court in the manner established by court rules," but instead "presented the agreement to the court in an informal setting and without an official record." ROA-PCR 3/27/00 Am. Pet. at 11. The PCR court denied relief:

> A hearing was conducted on this matter in the trial court and Defendant's attorney properly, aggressively, and professionally pursued the issue. There was no ineffective assistance of counsel in the court's rejection of the plea offer presented to it. As the court noted to counsel below, any plea which lacked accountability for the McClain homicide would have been rejected by

---

[14] Respondents counter that this claim is exhausted only to the extent that Petitioner argues that trial counsel was ineffective in pursuing the plea. Dkt. 80 at 37. The Court disagrees and finds that the full scope of the claim was presented in state court.

the Court.

ROA-PCR 6/1/01 Minute Entry at 4.

<u>Analysis</u>

The clearly established federal law for claims alleging ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id*. at 687-88. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.*

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689. Thus, to satisfy *Strickland*'s first prong, deficient performance, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

Under the AEDPA, this Court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *see Knowles v. Mirzayance,* 129 S. Ct. 1411, 1420 (2009) (noting that a "doubly deferential" standard applies to *Strickland* claims under AEDPA). Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an objectively unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1).

Petitioner has not made this showing. His allegation that counsel did not pursue plea negotiations is belied by the existence of the plea agreement that forms the basis of this

claim. In addition, he has failed to demonstrate that prejudice resulted from the manner in which counsel presented the agreement. The trial court rejected the plea because it failed to recognize Petitioner's responsibility for the McClain homicide – a point the court reiterated during the PCR proceedings. There is no evidence to suggest that the trial court's rejection of the plea somehow was based on the time and place of its presentation. What is more, after the court rejected the plea agreement Petitioner's counsel continued to negotiate with the prosecutor. Given all of these facts, the Court cannot conclude that the state court engaged in an objectively unreasonable application of *Strickland* when it found no ineffective assistance of counsel in plea negotiations. Claim 8 is denied.

**Claim 10      Ineffective assistance of appellate counsel**

Petitioner alleges that appellate counsel performed at a constitutionally ineffective level by failing to raise a claim that trial counsel were ineffective for failing to "voir dire the jurors on their inclinations toward the death penalty." Dkt. 71 at 107. Petitioner raised this issue in his PCR petition, ROA-PCR 3/27/00 Am. Pet. at 20, and the court rejected it, ROA-PCR 6/1/01 Minute Entry at 8. This Court denied the claim as meritless in a previous order, citing the fact that at the time of Petitioner's trial, the jury did not sentence capital defendants and there is no evidence that the death-penalty views of the jurors in Petitioner's case affected their decision as to his guilt. Dkt. 119 at 9-11.

The Fourteenth Amendment guarantees a criminal defendant the right to effective assistance of counsel on his first appeal. *Evitts v. Lucey*, 469 U.S. 387, 391-405 (1985). Under *Strickland*, a petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's deficient performance, the petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). "A failure to raise untenable issues on appeal does not fall below the *Strickland* standard," *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002), nor does appellate counsel have a constitutional duty to raise every nonfrivolous issue requested by a petitioner. *Miller v. Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989) (citing *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983)). Therefore, even if appellate counsel declines

to raise a weak issue, he will likely remain above an objective standard of competence and will have caused no prejudice. *Id.*

For the reasons explained in the court's previous order, there is no probability that Petitioner would have prevailed on appeal if appellate counsel had raised the claim that trial counsel were ineffective for failing to voir dire the jurors about their inclination toward the death penalty. *See* Dkt. 119 at 9-11. Therefore, Petitioner was not prejudiced by counsel's performance. The PCR court's denial of this claim was not contrary to or an unreasonable application of *Strickland*. Claim 10 is denied.

**Claim 12     Confrontation Clause violation**

Petitioner alleges that his Confrontation Clause rights were violated when the trial court refused to allow defense counsel to question a witness about his juvenile record.

Background

At trial, Joe Lemon was called as one of the State's witnesses. After Lemon provided some preliminary testimony, a brief recess was called and a hearing conducted out of the jury's presence to determine if Lemon could be impeached with his juvenile record. RT 10/28/92 at 77. McKinney's counsel, Mr. Allen, questioned Lemon. *Id.* Lemon had previously been interviewed by defense counsel, and no evidence of any juvenile adjudications had surfaced. *Id.* at 14-15. The prosecutor told the defense attorneys that Lemon had no juvenile convictions, but defense counsel wanted to question him again. *Id.*[15]

Lemon testified that he had been charged as a juvenile for aggravated assault. RT 10/28/92 at 79. He indicated that he had appeared before a judge on the charge but never had

---

[15]  Petitioner's lawyer, Mr. Leander, was not present during the voir dire of Lemon. On returning to the courtroom Leander objected to the hearing having taken place without him. RT 10/28/92 at 84. The judge refused to re-open the hearing unless Leander was prepared to introduce substantive evidence of juvenile adjudications. *Id.* Leander had no such evidence, but stated that he would like to question Lemon. *Id.* The judge refused to allow any more questioning, concluding that Leander and Allen shared an identity of interest, that Allen had adequately explored the issue, and that in doing so Allen had discovered no evidence of a juvenile adjudication. *Id.* at 84-85.

a hearing where witnesses were called, never pleaded guilty, and had not been adjudicated but was placed under house arrest for two weeks. *Id.* at 78-83. At the conclusion of the defense examination and the State's cross-examination, no evidence of any adjudication had been presented. Thus, the judge determined that under Rule 609 of the Arizona Rules of Evidence, Lemon could not be impeached with his juvenile record.[16] *Id.* at 83.

On direct appeal, the Arizona Supreme Court rejected Petitioner's claim that the refusal to let his attorney question Lemon about his record constituted a denial of the right to confrontation:

> Hedlund argues that his right to confrontation is paramount to the state's interest in protecting Lemon as a juvenile offender-witness. *See Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *State v. McDaniel,* 127 Ariz. 13, 617 P.2d 1129 (1980). In the abstract we agree with Hedlund's proposition, but we find his argument inapplicable to the facts of his case because Hedlund and his lawyer were present when Lemon testified and the lawyer was permitted to and did examine Lemon.
>
> Hedlund's complaint here is confined to the lawyer's absence at a hearing much like a motion in limine. Hedlund, however, has never proffered any evidence to show that Lemon had *any* juvenile adjudication, let alone one with which he could have been impeached. Indeed, as late as oral arguments in this court, Hedlund's counsel possessed no evidence that Lemon had ever

---

[16]    Arizona Rule of Evidence 609 provides, in relevant part:

(a) General rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record, if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect, and if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or (2) involved dishonesty or false statement, regardless of the punishment.

. . . .

(d) Juvenile adjudications. Evidence of juvenile adjudication is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.

- 38 -

been adjudicated as a juvenile. Furthermore, Lemon was not an accomplice in the crimes, was never charged, and was never offered immunity for his testimony. He was eighteen years old at trial and therefore could not have been on juvenile probation at the time of the trial. *See* Ariz. Const. art. VI, § 15. In sum, Hedlund fails to demonstrate how Lemon's juvenile record could have been used for anything other than a general attack on his character. *See State v. Morales,* 120 Ariz. 517, 520-21, 587 P.2d 236, 239-40 (1978); *cf. McDaniel,* 127 Ariz. at 15-16, 617 P.2d at 1131-32. We refuse to speculate whether Hedlund's lawyer would have discovered something at the Rule 609 hearing that McKinney's lawyer could not and did not and that neither lawyer has discovered to this day.

*McKinney*, 185 Ariz. at 574, 917 P.2d at 1221.

<u>Analysis</u>

State law matters, including a trial court's evidentiary rulings, are generally not proper grounds for habeas corpus relief. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) (internal quotation omitted); *see Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir. 1991). Therefore, a violation of Rule 609 cannot, by itself, furnish a basis for habeas relief.

The right to confront witnesses includes the right to cross-examine adverse witnesses to attack their general credibility or show possible bias or self-interest. *Olden v. Kentucky,* 488 U.S. 227, 231 (1988) (per curiam); *Delaware v. Van Arsdall,* 475 U.S. 673, 678-79 (1986); *Davis v. Alaska,* 415 U.S. 308, 316 (1973). However, "[t]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Thus, "judges retain wide latitude insofar as the Confrontation Clause is concerned" and may impose limitations on cross-examination that are "reasonable" and are not "arbitrary or disproportionate to the purposes they are designed to serve." *Van Arsdall*, 475 U.S. at 679.

A Confrontation Clause violation occurs when the defendant is prevented from investigating "a prototypical form of bias" and "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had respondent's counsel been

permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680. Because improper denial of the opportunity to impeach a witness for bias is subject to a harmless-error analysis, *id.* at 684, a petitioner is not entitled to relief unless he can establish that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. at 637. To determine if the error was harmless, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684.

A review of *Davis* is sufficient to establish that the Arizona Supreme Court did not unreasonably apply clearly established federal law in rejecting Petitioner's allegation of a Confrontation Clause violation. *Davis* involved a burglary in which a safe was taken from a bar. 415 U.S. at 309. The only eyewitness was a sixteen-year-old who claimed to have seen the defendants near his house with a crowbar. The safe was recovered near the juvenile witness's house. *Id.* at 310. The witness was on probation for burglary himself, a fact which defense counsel wanted to explore on cross-examination as a means of showing possible bias. *Id.* at 311. The trial court precluded impeachment on the issue because it conflicted with the state's interest in preserving the confidentiality of juvenile adjudications. *Id.* The Supreme Court reversed, holding that the "accuracy and truthfulness of [the witness's] testimony were key elements in the State's case against petitioner" and that the defense claim of bias was "admissible to afford a basis for an inference of undue pressure" based on the witness's "vulnerable status as a probationer" and his "possible concern that he might be a suspect in the investigation." *Id.* at 317-18. The Court also noted that the witness, in answering the questions defense counsel was allowed to ask, provided misleading testimony about his background and involvement in the case. *Id.* at 313-14.

In Petitioner's case, there was no showing that Lemon had a juvenile adjudication, and defense counsel's failure to make an offer of proof on the matter supported the judge's limitation on cross-examination. *See DiBenedetto v. Hall*, 272 F.3d 1, 10-11 (1st Cir. 2001) (court may circumscribe cross-examination if the party is unable to lay a proper evidentiary

framework); *Bui v. DiPaolo*, 170 F.3d 232, 243-46 (1st Cir. 1999) ("One well-established basis for circumscribing cross-examination is a party's inability to lay a proper evidentiary foundation for the questions he wishes to pose"); *Jones v. Berry*, 880 F.2d 670, 674-75 (2d Cir. 1989) (no violation where the record suggested no information which continued questioning would have exposed and counsel failed to make an offer of proof).

Therefore, in contrast to the situation in *Davis*, the desire of Petitioner's counsel to elicit testimony about Lemon's involvement in the juvenile system could have been used for nothing but a general character attack. As the Arizona Supreme Court noted, Lemon was not an accomplice in Petitioner's crimes; he was never charged and was not offered immunity for his testimony. *McKinney*, 185 Ariz. at 574, 917 P.2d at 1221. Thus, the proposed cross-examination did not constitute an otherwise appropriate effort to impeach Lemon's credibility or explore a prototypical form of bias such as a plea agreement, a reduced sentence, or other "ulterior motives of the witness." *Davis*, 415 U.S. at 316; *see Olden*, 488 U.S. at 231 (Confrontation Clause violation occurred when the trial court excluded cross-examination regarding evidence that the complainant in a sexual misconduct trial was living with the prosecution's key witness at the time of trial and thus had a motive to lie in order to protect her current relationship); *Van Arsdall*, 475 U.S. at 680 (violation where the trial court barred any cross-examination concerning a plea deal by which criminal charges against the witness were dropped in exchange for his promise to speak with the prosecutor about the murder charge against the defendant). Finally, unlike the situation in *Davis*, Lemon was not the State's key witness against Petitioner. Morris also provided important testimony, and circumstantial evidence clearly linked Petitioner to the crimes.

Other factors demonstrate that Petitioner suffered no prejudice from the trial court's ruling. On cross-examination, McKinney's counsel asked Lemon if he was receiving any benefit from the prosecution in exchange for his testimony; Lemon answered that he was not. RT 10/28/92 at 106. Therefore, one of the prototypical areas of potential bias was explored. Also, although a prosecution witness, Lemon offered largely favorable testimony about Petitioner's non-violent character, reluctance to participate in some of the burglaries, and

positive financial situation, *id.* at 96-98, 102, 128-30, so that impeachment would have served no purpose or been counterproductive.

Petitioner has not shown that the trial court's exclusion of testimony regarding Lemon's juvenile record had a substantial, injurious impact on the jury's verdict. *Brecht*, 507 U.S. at 637. Petitioner is not entitled to relief on Claim 12.

**Claim 13       Ineffective assistance of trial counsel – cross-examination**

Petitioner alleges that counsel provided ineffective assistance by eliciting prejudicial information, including evidence that Petitioner was involved in an additional burglary, during his cross-examination of prosecution witness Chris Morris. Dkt. 71 at 97. The PCR court found that Petitioner failed to show deficient performance or prejudice, explaining:

> this criticism is now in hindsight, simply questioning competent, capable trial counsel's choice of strategy in questioning of witnesses. Furthermore . . . even had a different approach been taken to the questioning of witnesses, it is uncertain, and clearly not demonstrated by the Defendant, that the outcome of this case would have been any different. This claim is summarily rejected by the Court.

ROA-PCR 6/1/01 Minute Entry at 4-5.

The PCR court's ruling is not an unreasonable application of *Strickland*. To withstand scrutiny under *Strickland*, counsel's representation must be only objectively reasonable, not flawless or to the highest degree of skill. *Dows v. Wood*, 211 F.3d at 487 (citing *Strickland*, 466 U.S. at 688-89). Tactical decisions made during trial, such as those Petitioner's counsel made with respect to the questioning of Morris, are given great deference. *Id.* For example, in *Phyle v. Leapley*, 66 F.3d 154, 159 (8th Cir. 1995), the Eighth Circuit rejected the habeas petitioner's claim that trial counsel was ineffective based on his failure to object to testimony by the key prosecution witness regarding prior violent acts by the petitioner. Applying the presumption that counsel's conduct fell within the wide range of reasonable professional assistance, *Strickland*, 466 U.S. at 689, the Court of Appeals emphasized that trial tactics with respect to the questioning of witnesses are entitled to special deference:

> trial lawyers must take into account [broad, highly subjective factors] as they make repeated, instantaneous decisions whether to object to a question, whether to move to strike a damaging unresponsive answer, or whether to

> move for a mistrial when a witness has delivered an unexpected low blow. When we review such trial decisions, the ineffective assistance standard is high – they are virtually unchallengeable – in part because appellate judges cannot recreate from a cold transcript the courtroom dynamics that are an essential part of evaluating the effectiveness of counsel's performance.

*Phyle*, 66 F.3d at 159 (citation omitted).

Applying the standard of deference mandated by *Strickland* and the AEDPA, Petitioner has not shown that counsel was ineffective in his handling of Morris's testimony on cross-examination. Petitioner has not overcome the presumption that counsel's strategy in cross-examining the witness was reasonable; nor, based on the content of the testimony, can he establish prejudice. The defense strategy was to portray Petitioner as a passive, unwilling participant in the burglaries and McKinney as the instigator of the violence. On cross-examination, Morris testified that he and McKinney committed the third burglary and Petitioner did not participate. RT 10/29/92 at 129. In fact, according to Morris, Petitioner was "scared and wanted to keep his distance"; he waited in the car and fell asleep while McKinney and Morris entered the residence. *Id.* While this information supported the defense theory, Petitioner complains that the testimony allowed the prosecutor to elicit damaging testimony on redirect concerning McKinney's statement that he and Morris should have stayed in the residence and shot the occupant, buttressing the State's position that Petitioner was aware that McKinney was prepared to use violence during the burglaries. *See id.* at 178. McKinney's statement, however, was made to Morris outside of Petitioner's presence. Thus, compared with other testimony that McKinney and Petitioner himself indicated a willingness to use violence against the occupants of the targeted residences, Morris's testimony on redirect was not prejudicial to Petitioner's defense. *See Boyde v. Brown*, 404 F.3d 1159, 1174-76 (9th Cir. 2005) (counsel's performance in eliciting testimony concerning defendant's prior robberies was reasonable trial strategy, enabling counsel to bolster his argument that co-defendant committed the murder, given that although defendant had robbed many people, he had never killed anyone); *see also Edwards v. Lamarque*, 475 F.3d 1121, 1127-29 (9th Cir. 2007) (state appellate court was not objectively unreasonable in determining that counsel made a reasonable, tactical decision to ask the questions that led

to defendant's waiver of the spousal privilege); *Pizzuto v. Arave*, 280 F.3d 949, 967 (9th Cir. 2002) (denying relief where decision to call witness was "plainly strategic" and "probably beneficial overall").

The PCR court did not unreasonably apply *Strickland*. Claim 13 is denied.

**Claim 14     Ineffective assistance of trial counsel – defense strategy**

Petitioner alleges that counsel provided ineffective assistance by "pursuing a strategy of blaming James McKinney," which prejudiced the defense by pitting defense counsel against each other and strengthening the State's case. Dkt. 71 at 97. The PCR court denied this claim, concluding that "[t]his issue simply raises a difference of opinion regarding trial strategy and is not a sufficient basis for demonstrating ineffective assistance of counsel." ROA-PCR 6/1/01 Minute Entry at 5. That decision does not represent an unreasonable application of *Strickland*.

Petitioner has failed to show that counsel's performance was deficient. As the *Strickland* Court explained: "It is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable." 466 U.S. at 689; *see Thompson v. Haley*, 255 F.3d 1292, 1299 (11th Cir. 2001) (counsel acted reasonably in eliciting testimony in capital murder trial that defendant had participated with co-defendant girlfriend in various robberies and shared her lifestyle, given strategy of assigning primary responsibility for murder to co-defendant and portraying defendant as under her influence and bearing limited responsibility for murder); *cf. Mirzayance*, 129 S. Ct. at 1419 (competent performance does not require counsel to present a particular defense simply because there is "nothing to lose" by doing so).

As Respondents note, the reasonableness of counsel's strategy is supported both by Petitioner's failure to identify an alternative defense theory and by the verdict with respect to the Mertens murder, in which McKinney was convicted of first degree murder and Petitioner was not. For the same reasons, he has failed to show prejudice – that if counsel had pursued a different, unnamed defense strategy, there was a reasonable probability of a

different verdict. Claim 14 is denied.

**Claim 16        Pecuniary gain aggravating factor**

Petitioner contends that his rights under the Eighth and Fourteenth Amendments were violated when the state courts found that he committed the offense in expectation of something of pecuniary value, thereby satisfying the aggravating factor set forth in A.R.S. § 13-703(F)(5). Dkt. 71 at 144-48.

Respondents contend that the claim is procedurally barred because Petitioner did not present the federal basis of the claim on direct appeal. Dkt. 80 at 54. Petitioner contends that the federal constitutional basis of the claim is "implicit" and alleges ineffective assistance of appellate counsel as cause for any procedural default. Dkt. 91 at 105-07.

On appeal, Petitioner argued only that the sentencing court erred in determining that the murders were committed for pecuniary gain under Arizona law. Opening Br. at 50-51. Because he did not cite a federal basis for the claim, the claim was not fairly presented to the state supreme court. *See Baldwin v. Reese*, 541 U.S. 27 (2004). However, the Arizona Supreme Court considered the pecuniary gain aggravating factor during its independent sentencing review. *McKinney*, 185 Ariz. at 583-84, 917 P.2d at 1230-31. This Court must determine whether that review exhausted the claim.

The Arizona Supreme Court independently reviews each capital case to determine whether the death sentence is appropriate. In *State v. Gretzler,* 135 Ariz. 42, 54, 659 P.2d 1, 13 (1983), the court stated that the purpose of independent review is to assess the presence or absence of aggravating and mitigating circumstances and the weight to give to each. To ensure compliance with Arizona's death penalty statute, the state supreme court reviews the record regarding aggravation and mitigation findings and decides independently whether the death sentence should be imposed. *State v. Brewer*, 170 Ariz. 486, 493-94, 826 P.2d 783, 790-91 (1992). The Arizona Supreme Court has also stated that in conducting its review it determines whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factors. *State v. Richmond,* 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *sentence overturned on other grounds, Richmond v. Cardwell,* 450 F.Supp. 519

(D.Ariz.1978).  Arguably, such a review rests on both state and federal grounds.  *See Brewer,* 170 Ariz. at 493, 826 P.2d at 790 (finding that statutory duty to review death sentences arises from need to ensure compliance with constitutional safeguards imposed by the Eighth and Fourteenth amendments).

While the state court's independent review does not encompass any and all alleged constitutional error at sentencing, the Court must determine if it encompassed Petitioner's claim that the trial court erred in finding the pecuniary gain aggravating factor.  In its written opinion, the Arizona Supreme Court reviewed the aggravating factors found by the sentencing judge to independently determine their existence and whether a death sentence was appropriate.  *McKinney,* 185 Ariz. at 577-84, 917 P.2d at 1225-31.  With respect to the pecuniary gain factor, the supreme court reviewed the evidence in the record and determined that the pecuniary gain factor had been satisfied.  *Id.* at 583-84, 917 P.2d at 1230-31.  The supreme court's actual review of the trial court's finding of the (F)(5) factor sufficiently exhausted Claim 16.  *See Sandstrom v. Butterworth,* 738 F.2d 1200, 1206 (11th Cir. 1984). Thus, the Court finds that Claim 16 was actually exhausted, and it will be reviewed on the merits.

Analysis

The trial court found that the factor was satisfied based on the "overwhelming" evidence that Petitioner and McKinney "were consciously involved in an ongoing crime spree to commit residential burglaries and intended to either kill or beat any of the victims who might have been present during these crimes."  RT 7/30/93 at 14.  The Arizona Supreme Court agreed:

> Simply receiving profit as the result of a murder is not enough to satisfy the requirements of § 13-703(F)(5), but killing for the purpose of financial gain is sufficient.  Both of these murders were committed in the course of an ongoing burglary spree.  The purpose of the burglaries was to find cash or property to fence.  Items stolen from the McClain residence were in fact sold.  Clearly, the evidence of pecuniary gain as the primary, if not sole, purpose of the murders is overwhelming and inescapable.  Thus, we affirm the finding that Hedlund murdered for pecuniary gain.

*McKinney,* 185 Ariz. at 583-84, 917 P.2d at 1230-31 (citation omitted).

Habeas review "is limited, at most, to determining whether the state court's finding was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). In making that determination, the reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the factor had been satisfied." *Id.* at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

"[A] finding that a murder was motivated by pecuniary gain for purposes of § 13-703(F)(5) must be supported by evidence that the pecuniary gain was the impetus of the murder, not merely the result of the murder." *Moormann*, 426 F.3d at 1054. Based upon the facts proven at the trial, a rational factfinder could have determined that McClain was murdered in the expectation of pecuniary gain and that Petitioner was motivated by the expectation of such gain. *See Correll v. Stewart*, 137 F.3d 1404, 1420 (9th Cir. 1998); *Woratzeck v. Stewart*, 97 F.3d 329, 336 (9th Cir. 1996).

Viewed in the light most favorable to the State, the evidence showed that Petitioner participated in a series of burglaries before the McClain burglary in an attempt to acquire property and cash; that he and McKinney each indicated that they would use violence against the occupants of the homes they burglarized; that he knew McClain from the previous car purchase; that he hid the weapon used in the first murder; that his weapon, the sawed off .22 rifle, was used in McClain's murder; that he searched through McClain's briefcase during the robbery; that he participated in the sale of weapons stolen from McClain; and that after the murder he concealed evidence of the crimes, including the sawed off rifle. "Murdering a person to facilitate a robbery and escape constitutes murdering for pecuniary gain." *State v. Mann*, 188 Ariz. 220, 227, 934 P.2d 784, 791 (1997). There is no competing evidence suggesting a motive for the murder other than the expectation of pecuniary gain. *Compare State v. LaGrand*, 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987) ("When the defendant comes to rob, the defendant expects pecuniary gain and this desire infects all other conduct of the defendant.") *with State v. Wallace*, 151 Ariz. 362, 368, 728 P.2d 232, 238 (1986)

(insufficient evidence to support pecuniary gain aggravating factor where defendant's motive was relationship difficulties with the victim and the taking of money and keys was incidental to the murder). Here, the burglaries "permeated [Petitioner's] entire conduct." *LaGrand*, 153 Ariz. at 36, 734 P.2d at 578. The state courts correctly determined that the pecuniary gain factor was established. Petitioner is not entitled to relief on Claim 16.

**Claim 17      Resentencing**

Petitioner contends that he was entitled to be resentenced by the trial court or to be given a reduced sentence after the Arizona Supreme Court struck down one of the aggravating factors found by the trial court. Dkt. 71 at 149. He argues that the Arizona Supreme Court failed to properly account for the mitigation evidence after striking the aggravator and reweighing with pecuniary gain as the sole aggravating factor.[17]

This claim is plainly meritless. The Arizona Supreme Court fulfilled its constitutional obligation of ensuring an "individualized sentence" by "reweighing at the . . . appellate level." *Stringer v. Black*, 503 U.S. 222, 231-32 (1992); *see Parker v. Dugger*, 498 U.S. 308, 320. In affirming Petitioner's death sentence, the supreme court took into account the remaining aggravating factor and the mitigating evidence:

> We have concluded that the trial judge erred in finding Hedlund had a prior conviction for a felony involving violence and agree with the finding of the (F)(5) aggravating circumstance. Therefore, we reweigh the aggravating and mitigating circumstances. Because the judge did not improperly exclude mitigating evidence at sentencing and the mitigating evidence is not of great weight, this case is appropriate for reweighing by this court rather than remanding to the trial court. In our reweighing, we must decide whether the sole aggravator – pecuniary gain – outweighs the mitigating circumstances discussed above or whether those mitigators are sufficiently substantial to call for leniency.
>
> In comparison to the mitigating circumstances here, the quality of the aggravating circumstance is great. To apply a recent analogy, this is not the case of a convenience store robbery gone bad but, rather, one in which

---

[17]  Petitioner asserts that he properly exhausted this claim by raising it in his PCR petition. He further argues that because the court did not specifically address the issue in its order denying relief, this Court must apply a de novo standard of review. Respondents counter that Petitioner failed to present the federal basis of the claim. Regardless of the claim's procedural status, it does not entitle Petitioner to habeas relief.

pecuniary gain was the catalyst for the entire chain of events leading to the murders. The possibility of murder was discussed and recognized as being a fully acceptable contingency.

> . . . [T]his is a case in which Defendants deliberately and unnecessarily killed to accomplish the burglary. We have encountered pecuniary gain as the sole aggravator in other cases in which the death penalty was not imposed, but the quality of Hedlund's conduct in this case certainly gives great weight to the aggravating circumstance. We therefore believe that the aggravating circumstance of pecuniary gain clearly outweighs the minimal mitigating evidence.

*McKinney*, 185 Ariz. at 584, 917 P.2d at 1231 (citations and footnotes omitted).

The state court engaged in a proper reweighing process. Claim 17 is denied.

**Claim 18      Jury determination of aggravating factors**

Petitioner alleges his right to equal protection was violated by the failure to have a jury make all necessary factual determinations for a sentence of death because non-capital defendants are afforded that right. Dkt. 71 at 77. The Arizona Supreme Court summarily rejected this claim. *McKinney*, 185 Ariz. at 578, 917 P.2d at 1225.

Petitioner fails to cite, and the Court is not aware of, any clearly established Supreme Court law in support of his position. Therefore, he cannot be entitled to habeas relief. *See Musladin*, 549 U.S. at 77. Moreover, the Ninth Circuit has explicitly rejected this claim. *Jeffers*, 38 F.3d at 419 (noting that judicial sentencing is rational as it is potentially more consistent than jury sentencing) (quoting *Proffitt v. Florida*, 428 U.S. 242, 252 (1976)). Claim 18 is denied.

**Claim 19      *Ring* violation**

Petitioner contends that he was entitled to be sentenced by a jury under *Ring v. Arizona*, 536 U.S. 584, 609 (2002). Dkt. 71 at 144-49. This claim is plainly meritless. In *Ring*, the Supreme Court held that Arizona's aggravating factors are an element of the offense of capital murder and therefore must be found by a jury. In *Schriro v. Summerlin*, 542 U.S. 348 (2004), however, the Court held that *Ring* does not apply retroactively to cases already final on direct review. Because direct review of Petitioner's case was final prior to *Ring*, he is not entitled to federal habeas relief premised on that ruling. Claim 19 is denied.

**Claim 20        Arizona death penalty statute**

Petitioner contends that "Arizona's Death Penalty does not sufficiently channel [the] sentencer's discretion." Dkt. 71 at 154. He also argues that the "mandatory" nature of Arizona's death penalty scheme improperly limits the sentencer's discretion. *Id.* at 155. The Arizona Supreme Court rejected these contentions on direct appeal. *McKinney*, 185 Ariz. at 578, 917 P.2d at 1225. They are without merit.

Rulings of both the Ninth Circuit and the United States Supreme Court have upheld Arizona's death penalty statute against allegations that particular aggravating factors do not adequately narrow the sentencer's discretion. *See Jeffers*, 497 U.S. at 774-77; *Walton v. Arizona*, 497 U.S. 639, 649-56 (1990); *Woratzeck*, 97 F.3d at 335. The Ninth Circuit has also explicitly rejected the contention that Arizona's death penalty statute is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith,* 140 F.3d at 1272.

In *Walton*, the Supreme Court rejected the argument that "Arizona's allocation of the burdens of proof in a capital sentencing proceeding violates the Constitution." 497 U.S. at 651. *Walton* also rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty because it provides that the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for leniency. *Id.* at 651-52 (citing *Blystone v. Pennsylvania*, 494 U.S. 299 (1990), and *Boyde v. California*, 494 U.S. 370 (1990)); *see Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006) (relying on *Walton* to uphold Kansas's death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators); *Smith*, 140 F.3d at 1272 (summarily rejecting challenges to the "mandatory" quality of Arizona's death penalty statute and its failure to apply the beyond-a-reasonable-doubt standard). Claim 20 is denied.

**Claim 21        Proportionality review**

Petitioner alleges that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated by the state courts' failure to provide the "procedural safeguard"

of proportionality review of his capital sentence. Dkt. 71 at 157. He is not entitled to relief on this claim. There is no federal constitutional right to proportionality review of a death sentence, *McCleskey v. Kemp,* 481 U.S. 279, 306 (1987) (citing *Pulley v. Harris,* 465 U.S. 37, 43-44 (1984)), and the Arizona Supreme Court discontinued the practice in 1992, *State v. Salazar,* 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992). The Ninth Circuit has explained that the interest implicated by proportionality review – the "substantive right to be free from a disproportionate sentence" – is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja,* 97 F.3d at 1252. Claim 21 is denied.

**Claim 22      Lethal injection**

Petitioner alleges that Arizona's protocol for execution by lethal injection involves the unnecessary and wanton infliction of pain and suffering in violation of the Eighth Amendment. Dkt. 71 at161. This allegation does not entitle Petitioner to habeas relief. The Supreme Court has never held that lethal injection constitutes cruel and unusual punishment, *see Baze v. Rees*, 128 S. Ct. 1520 (2008), and the Ninth Circuit has concluded that death by lethal injection in Arizona does not violate the Eighth Amendment, *see LaGrand v. Stewart*, 133 F.3d 1253, 1265 (9th Cir. 1998); *Poland v. Stewart*, 117 F.3d 1094, 1104-05 (9th Cir. 1997). Therefore, the Arizona Supreme Court's rejection of the claim, *State v. McKinney*, 185 Ariz. at 578, 917 P.2d at 1225, was neither contrary to nor an unreasonable application of clearly established federal law.   Claim 22 is denied

**Claim 23      Cumulative error**

Petitioner contends that the cumulative effect of the errors in his trial mandates a reversal of his conviction and sentence. Dkt. 71 at 173.

Respondents contend that the claim was never presented in state court and therefore is unexhausted and procedurally defaulted. Dkt. 80 at 60. Petitioner counters that he exhausted the claim by identifying in state court the individual errors that occurred during his trial, thereby affording the courts an opportunity to consider his claim of cumulative error. Dkt. 91 at 134. The Court disagrees and concludes that Petitioner failed to present his cumulative error claim in state court. *See, e.g.*, *Jimenez v. Walker*, 458 F.3d 130, 148-49 (2d

Cir. 2006) (cumulative error claim not properly exhausted).

Alternatively, Petitioner cites as cause for the default ineffective assistance of appellate and PCR counsel. Dkt. 91 at 135. As previously noted, before ineffectiveness may be used to establish cause for a procedural default it must have been presented to the state court as an independent claim. *See Edwards*, 529 U.S. at 451-53; *Murray*, 477 U.S. at 489-90. Petitioner never asserted appellate ineffective assistance of counsel for failing to raise Claim 23. Because he is now precluded by Rules 32.2(a)(3) and 32.4 from presenting this claim in state court, he cannot establish ineffective assistance on appeal as cause for the default of Claim 23. Moreover, because there is no right to effective post-conviction counsel, *see Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Murray v. Giarratano*, 492 U.S. 1, 7-12 (1989), ineffective assistance of PCR counsel cannot constitute cause for the default.

Petitioner has failed to establish cause for the default of this claim and does not argue that a fundamental miscarriage of justice will occur if the claim is not decided on the merits. Accordingly, Claim 23 is procedurally barred and will be dismissed with prejudice.

**Claim 25** *Lackey*

Petitioner contends that his execution after more than ten years on death row would serve no legitimate penological purpose and therefore would violate the Eighth Amendment. Dkt. 71 at 178. This claim is unexhausted and meritless. The Supreme Court has not held that lengthy incarceration prior to execution constitutes cruel and unusual punishment. *See Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim has not been addressed); *Thompson v. McNeil*, 129 S. Ct. 1299 (2009) (mem.) (Stevens, J. & Breyer, J., dissenting from denial of certiorari; Thomas, J, concurring, discussing *Lackey* issue). Circuit courts, including the Ninth Circuit, have held that prolonged incarceration under a sentence of death does not offend the Eighth Amendment. *See McKenzie v. Day*, 57 F.3d 1493, 1493-94 (9th Cir. 1995) (en banc); *White v. Johnson*, 79 F.3d 432, 438 (5th Cir. 1996); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995). Accordingly, Petitioner cannot establish a right to federal habeas relief, *see Allen v. Ornoski*, 435 F.3d 946, 958-60 (9th Cir. 2006), and Claim 25 is denied.

## CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that might be consumed drafting and reviewing an application for a certificate of appealability ("COA") to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claims 1, 2, and 7. For the reasons stated in this Order, and in the Court's Order of March 31, 2005, Dkt. 119, the Court declines to issue a COA with respect to any other claims.

**IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus, Dkt. 71, is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on January 22, 2002, Dkt. 3, is **VACATED.**

**IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the following issues:

Whether Claim 1 of the Amended Petition – alleging that Petitioner's rights were violated by the use of a leg brace at his trial – is without merit.

Whether Claim 2 of the Amended Petition – alleging that Petitioner's rights were violated by the use of dual juries – is without merit.

Whether Claim 7 of the Amended Petition – alleging that Petitioner's rights were violated by the presence of a biased juror – is without merit.

**IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 10th day of August, 2009.


_____
David G. Campbell
United States District Judge